IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ABDULKARDIR NUR,              )
                              )
         v.                   )
                              )   Case No. 1:22-cv-169 (AJT/JFA)
UNKNOWN CBP OFFICERS, *et al.*, )
                              )
         Defendants.          )
_____)

### MEMORANDUM OPINION

On February 17, 2022, Nur filed his Complaint against Chris Magnus, Commissioner, U.S. Customs and Border Protection, and Christopher Wray, Director, Federal Bureau of Investigations, in their official capacity only, bringing claims under the U.S. Constitution's Fourth Amendment and the Fifth Amendment's Self-Incrimination Clause, and the Administrative Procedure Act. [Compl.], ¶¶ 97-132.[1] In response to the Complaint, Defendants have filed a Motion to Dismiss Counts I-III for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6) [Doc. No. 21] and also a Motion to Dismiss Counts I-III for Lack of Subject-Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) [Doc. No. 28].

Upon consideration of the Motion, the memoranda submitted in support thereof and in opposition thereto, the arguments presented by counsel at the hearing held on September 21, 2022, the Court **GRANTS** Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

**I.    BACKGROUND**

All allegations are taken from the Complaint unless otherwise noted.

---

[1] Plaintiff also brought a count (Count IV) under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) against unknown CBP Officer Defendants. [Compl.], ¶¶ 133-37. Plaintiff has withdrawn that claim in light of the Supreme Court's recent decision in *Egbert v. Boule*, 142 S. Ct. 1793 (2022). [Doc. No. 19], at 2 n.1.

Plaintiff Abdulkadir Nur, a 69-year-old American citizen living in northern Virginia, is a Muslim and naturalized citizen from Somalia. [Compl.], ¶ 1. Nur has never been charged or convicted of any crime nor is he, to the best of his knowledge, under any government investigation. [Compl], ¶ 3. Yet, according to Plaintiff, "every single time he lands at Dulles International Airport or anywhere else from overseas," Customs and Border Patrol ("CBP") officers "illegally seize any phone or laptop" in his possession. [Compl.], ¶ 1. Plaintiff alleges that the constant seizure of his electronic devices by CBP officers is because of his placement on the federal terrorist watchlist [Compl.], ¶¶ 18, 77-96.

In September 2003, then-Attorney General John Ashcroft created the Terrorist Screening Center ("TSC") as a division of the FBI. [Compl.], ¶ 18. The TSC develops and maintains what was once called the Terrorism Screen Database ("TSDB") but is now called the Terrorist Screening Dataset ("TSDS"), and is otherwise known and/or referred to as the "federal terrorist watchlist" or "watchlist." [Compl.], ¶ 18; [Dkt. 29-1] (Declaration of Samuel P. Robinson (hereinafter "Robinson Decl.")), ¶¶ 1 n.1, 6, 8. The NCTC and FBI are the two government agencies who are primarily responsible for "nominating" individuals for inclusion on the federal terrorist watchlist. [Compl.], ¶ 19. The NCTC is responsible for nominating individuals with suspected links to international terrorism to the watchlist while the FBI handles the nomination of individuals with potential links to domestic terrorism. [*Id.*] The CBP can, and does, nominate individuals for inclusion on the terrorist watchlist. [Compl.], ¶ 20.

The TSC must approve all nominations to the federal terrorist watchlist. [Compl.], ¶ 22. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watchlist as a known or suspected terrorist ("KST"). [*Id.*] The TSC likewise handles the implementation of an individual's inclusion on the federal watchlist,

such as deciding which screening systems will receive information about that individual. [*Id.*] The federal government publicly states that before an individual can be added to the watchlist they must reasonably be suspected of being a known or suspected terrorist. [*Id.*], ¶ 23. Therefore, a government nominator, "must rely upon articulable intelligence or information which, based on the totality of the circumstances and taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." [*Id.*]; [Robinson Decl.], ¶ 9. The "totality of the circumstances" analysis for watchlist inclusion may include assessments of an individual's race, ethnicity, country of origin, religion, religious, religious practices, languages spoken, family, associations, travel history, social media history, and other activities and/or traits entitled to constitutional protections. [Compl.], ¶ 24.

Pointing to the rapid expansion of the watchlist (1.1 million new names added since 2009) and TSC's extremely high acceptance rate (~98%), Plaintiff alleges the totality of circumstances analysis is entirely too permissive and based on "loose standards and practices." [*Id.*], ¶¶ 37-38, 41. Plaintiff also alleges the watchlist is ineffective as the federal government has failed to publicly link the watchlist with stopping any act of terrorism. [*Id.*], ¶¶ 36, 43. In sum, according to Plaintiff, the "federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion, that they bear at best a fleetingly marginal connection to actual terrorist activities." [*Id.*], ¶ 41.

When an individual is added to the watchlist, the derogatory information or "totality of the circumstances" information that formed the basis of the nomination is not included. [*Id.*], ¶ 55. Therefore, CBP only has access to the listee's identifying information and not the underlying

information that supported the individual's nomination. [*Id.*], ¶¶ 56, 63. CBP automatically designates watchlist listees as "Armed and Dangerous," refers them to secondary inspection, and otherwise automatically flags them as potential terrorists in automated alerts sent to officers. [*Id.*], ¶ 58.

Plaintiff alleges that pursuant to an official CBP policy issued in 2018, CBP officers are directed to conduct an advanced forensic search of any electronics carried by a federal terrorist watchlist listee ("CBP Electronic Devices Policy"). [*Id.*], ¶ 70.[2] The CBP Electronic Devices Policy provides that an individual's presence on the watchlist constitutes sufficient grounds for a CBP officer to search, copy, store, and analyze the contents of laptops, tablets, smartphones, etc. without requesting or obtaining consent. [*Id.*], ¶ 71. CBP officers, as noted previously, lack access to the underlying information that supported an individual's inclusion on the federal terrorist watchlist. [*Id,*], ¶ 72. The exact language of the policy is as follows:

> An advanced search is any search in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents. In instances in which there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern, and with supervisory approval . . . an Officer may perform an advanced search of an electronic device. Many factors create reasonable suspicion or constitute a national security concern; examples include . . . the presence of an individual on a government-operated and government-vetted terrorist watchlist.

Electronic Device Policy § 5.1.4.

Plaintiff is a prominent business owner and humanitarian. [*Id.*], ¶ 75. He frequently engages in international and domestic travel as part of his employment. [*Id.*] Plaintiff also serves as the CEO of a water welling and drilling company in Somalia. [*Id.*], ¶ 76. Since 1997, he has worked with humanitarian groups, such as the Red Cross, to deliver food and resources to impoverished

---

[2] The policy speaks to "advanced searches" not "forensic searches." However, the difference is likely immaterial. *Alasaad v. Mayorkas*, 988 F.3d 8, 13 n.3 (1st Cir. 2021).

communities in East Africa. [*Id.*], ¶ 76. In September 2008, while providing logistical support to a United Nations relief program, insurgents raided Plaintiff's caravan. [*Id.*], ¶ 77. A United Nations Monitor Group launched an investigation, ultimately finding Plaintiff not at fault. [*Id.*], ¶ 77. The investigation, however, drew attention from the FBI and a U.S. Attorney's Office as they demanded various records from Plaintiff and his company. [*Id.*], ¶ 78. Plaintiff cooperated with both the U.N. and FBI investigations. [*Id.*], ¶¶ 77-78. After the U.N. Monitor Group released its report, the FBI and the U.S. Attorney's Office investigating Plaintiff for potential crimes, communicated to Plaintiff they were no longer interested in bringing charges and stopped returning his calls to provide further exculpatory evidence. [*Id.*], ¶ 79.

Around the time of his Somalia-related investigation, Plaintiff consistently noticed a "SSSS" marking on his boarding passes and was constantly being subjected to secondary inspection and interrogation. [*Id.*], ¶ 80. Plaintiff alleges these were "telltale signs that the government had assigned him a disfavored status that would subject him to a segregated process in all of his encounters with the federal government." [*Id.*] Plaintiff did not travel to the United State for approximately 8 years (2010-2018) following these instances. [*Id.*], ¶ 81.

Upon his resumption of travel to the United States in 2018, Plaintiff experienced additional government targeting, such as the search and seizure of his person and electronic devices, enhanced screenings, hours-long delays, prolonged interrogations which involved harassing and aggressive behavior, and detention in separate interrogation rooms. [*Id.*], ¶ 82.

Following every flight into the U.S. from 2018, CBP officers seized Plaintiff's electronic devices and demanded the passwords to access the device. [*Id.*], ¶ 83. Believing he had no choice, Plaintiff gave his passwords, including biometric scans, after which the officers took the devices out of the room to copy, download, or upload data before returning the devices to Plaintiff upon

his eventual release. [*Id.*] Beginning in 2020, however, Plaintiff refused to give the CBP officers the required passwords. [*Id.*], ¶ 84. In response, CBP officers engaged in aggressive intimidation tactics and, on multiple occasions, still seized Plaintiff's electronic devices, refusing to return them until they conducted a forensic search offsite, which could take days or even weeks. [*Id.*] Plaintiff alleges 8 specific instances of travel to the U.S. since 2018 where his electronic devices were, or threatened to be, seized and searched:

- **April 28, 2018**: Flight from Toronto to Boston. Plaintiff detained for more than 5 hours. CBP officers probed Plaintiff on his occupation, family relationships, and religion. During the interrogation, CBP officers took Plaintiff's electronic devices into another room after Plaintiff provided them with the necessary passwords. [*Id.*], ¶ 85.

- **October 9, 2019**: Flight from Dubai to Dulles International Airport. Detained in separate interrogation room for several hours. Once again, CBP officers took Plaintiff's electronic devices into another room after Plaintiff provided them with the necessary passwords. [*Id.*], ¶ 86.

- **February 2020**: Flight into Dulles International Airport. Received similar treatment as his October 9, 2019 Flight. [*Id.*], ¶ 87.

- **June 30, 2020**: Flight from Dar es Salaam, Tanzania to Dulles International Airport. Plaintiff originally planned to fly to Washington, D.C. from Nairobi, Kenya via Addis Ababa, Ethiopia, on June 25 but was denied a boarding pass because the "U.S. government had not cleared him in the system" to travel to the U.S. Upon arriving at Dulles, Plaintiff was detained for several hours in an interrogation room while being searched, patted down, and interrogated. When asked for his electronic devices' passwords, Plaintiff refused, resulting in CBP officers shoving Plaintiff against a wall, being aggressively searched, removal of his shoes. CBP officers eventually released Plaintiff after his continued refusal to share his passwords. [*Id.*], ¶¶ 88-89.

- **August 15, 2020**: Flight from Dubai to Dulles. Plaintiff again detained in a separate interrogation room. CBP officers sought the passwords to Plaintiff's electronic devices but Plaintiff refused to provide. The officers became aggressive in an attempt to intimidate Plaintiff. The officers eventually took Plaintiff's devices into another room while another agent, which Plaintiff believes was from the FBI, further interrogated him. [*Id.*], ¶ 90.

- **May 4, 2021**: Flight from Dubai to Boston. Plaintiff detained in an interrogation room. Plaintiff again refused to give his passwords. When he refused, the officers took Plaintiff's devices and held him for several hours. [*Id.*], ¶ 91.

- **September 2021**: Flight to Dulles. Plaintiff handed CBP officers a letter from his attorney, instructing CBP that Plaintiff had legal representation and would not submit to questioning. Plaintiff refused to provide his passwords, so the officers seized his laptop, cell phone, and flash drive, only shipping those devices to Plaintiff's lawyers' office two weeks later. [*Id.*], ¶ 92.

- **January 25, 2022**: Flight from Nairobi, Kenya via Addis Ababa, Ethiopia to Dulles. Plaintiff detained for two hours. When he refused to give his passwords, the CBP officer promised the detention would be over quicker if Plaintiff complied. [*Id.*], ¶ 93.

Plaintiff minimizes his travel as much as possible in order to avoid the intense fear and expense that comes with being labeled as a "known or suspected terrorist" because of his status on the federal terrorist watchlist. [*Id.*], ¶ 94.

## II. LEGAL PRINCIPLES

### A. 12(b)(1) Standard

Federal courts are courts of limited jurisdiction with specific jurisdictional requirements and limitations, possessing only the jurisdiction authorized them by the United States Constitution and federal statute. *United States* ex rel. *Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009); *see also United States v. Mitchell*, 683 F. Supp. 2d 427, 428 (E.D. Va. 2010). "Article III of the Constitution requires a litigant to possess standing to sue in order for a lawsuit to proceed in federal court." *Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022) (citation omitted). Without Article III standing, the Court is left without subject matter jurisdiction. *Id.* at 595-96 ("Standing is an 'irreducible constitutional minimum' that must be satisfied in all cases." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992))). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

7

Rule 12(b)(1) is the appropriate vehicle to contest subject matter jurisdiction, and when confronted with a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing the court's subject matter jurisdiction. *Trinity Outdoor, L.L.C. v. City of Rockville*, 123 F. App'x 101, 105 (4th Cir. 2005) (per curiam). A Rule 12(b)(1) motion to dismiss may challenge the existence of subject matter jurisdiction over the case, separate and apart from the facts alleged in the pleadings. *Pro-Football, Inc. v. Blackhorse*, 62 F. Supp. 3d 498, 502 (E.D. Va. 2014) (citing *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)). Importantly, in this context, the district court "may then go beyond the allegations of the complaint" to determine independently the existence of jurisdiction. *Adams*, 697 F.2d at 1219; *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). If a district court lacks subject matter jurisdiction over an action, the action must be dismissed. *Jadhav*, 555 F.3d at 347.

B.  (12)(b)(6) Standard

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) should be granted unless the complaint "state[s] a claim to relief that is plausible on its face." *United States v. Triple Canopy*, 775 F.3d 628, 634 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). This "requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In considering a Rule 12(b)(6) motion, the Court must construe the complaint, read as a whole, in the light most favorable to the plaintiff and take the facts asserted therein as true. *LeSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264 (4th Cir. 2012). The general pleading standard requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . [and that] give[s] the defendant fair notice of what the claim is and the grounds upon

which it rests." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007) (internal quotations omitted); *see also* Fed. R. Civ. P. 8(a)(2). *Twombly* established that the "plain statement" must "possess enough heft"—that is, "factual matter"—to set forth grounds for the plaintiff's entitlement to relief "that is plausible on its face." 550 U.S. at 557, 570. The complaint must contain sufficient factual allegations that, taken as true, "raise a right to relief above the speculative level" and "across the line from conceivable to plausible." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (internal citations and quotations omitted).

### III.   ANALYSIS

#### A.   Lack of Subject Matter Jurisdiction

"There are two ways in which a defendant may present a 12(b)(1) motion. First, a defendant may attack the complaint on its face when the complaint 'fails to allege facts upon which subject matter jurisdiction may be based. . . . Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject matter jurisdiction over the case apart from the pleadings.'" *Blackhorse*, 62 F. Supp. 3d at 502 (citation omitted). Here, Defendants raise a factual challenge to Plaintiff's standing through *ex parte* submissions for *in camera* review that include law enforcement protected information. [Robinson Decl.], at 2-3; [Doc. No. 29-2], Ex. 2 (Declaration of Diane J. Sabatino (hereinafter "Sabatino Decl.")).

In his Complaint, Plaintiff seeks declaratory and injunctive relief against the Defendants, including an injunction that (1) "prohibits Defendants from applying CBP Policy that permits a forensic search of the electronic devices of US citizens or permanent residents solely because of watchlist status;" (2) "prohibits Defendants from applying CBP Policy that permits nonroutine detention and interrogation of US citizens or permanent residents solely because of watchlist status;" (3) "prohibits Defendants from ordering individuals at the border [to] provide passwords

9

or biometric means to access electronic devices, including by asserting or suggesting consequences (such as prolonged detention, confiscation or seizure of the person or the electronic device) for failure to provide passwords or biometric means of access;" and (4) "ordering Defendants to remove the status and annotations imposed on Mr. Nur, expunge any records regarding his illegal status and annotations, and expunge any information illegally seized from Mr. Nur." [Compl.], ¶ 141.

As a general proposition, in order for a plaintiff to have standing, (1) they must have "suffered an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted). As the party invoking jurisdiction, the plaintiff bears the burden of establishing these elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff "must demonstrate standing for each claim . . . and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks and citation omitted).

At issue here is the first element of the standing inquiry, the existence of an "injury in fact." Where, as here, a plaintiff seeks relief in the form of a forward-looking injunction, satisfying the injury in fact element requires Plaintiff to demonstrate that he is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical." *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding

injunctive relief." *Id.* (internal quotation marks and citation omitted). A plaintiff seeking forward-looking injunctive relief must demonstrate the existence of a future "threatened injury [that is] certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (internal quotation marks and citation omitted).

While Defendants argue that the *ex parte* Robinson and Sabatino Declarations, submitted *in camera*, establish that Plaintiff lacks standing, Defendants also contend that the Court need not even reach the sealed, *ex parte* portions of the declarations in dismissing the Complaint because the public, redacted versions of the Declarations demonstrate that Plaintiff lacks standing. [Doc. No. 35], at 2-3. For example, the public version of the Sabatino declaration attests that "According to CBP records, CBP did not conduct an advanced search on any electronic device in possession of Plaintiff from January 1, 2018, until the filing of the Complaint on February 17, 2022." [*Id.*], ¶ 35. The government contends that that fact alone demonstrates that Plaintiff lacks standing. There are several issues with the government's proffered approach.

As an initial matter, the redacted versions of the declarations actually *confirm* many of Plaintiff's allegations, including that he was stopped on multiple occasions by CBP officers and referred for secondary inspections that lasted anywhere from thirty minutes to three hours and forty-five minutes. [*Id.*], ¶¶ 18-33. Therefore, the core question is whether CBP officers performed an advanced search on any of Plaintiff's electronic devices, which is the heart of this lawsuit. Plaintiff alleges that Defendants performed advanced searches on his electronic devices, including an occasion where CBP officers confiscated Plaintiff's laptop computer, cell phone, and flash drive for two weeks before shipping the devices to his lawyers' office, while Defendants claim they did not. [Compl.], ¶ 92. Therefore, the jurisdictional facts are "inextricably intertwined" with the merits of his claims. The Fourth Circuit, in *Kerns v. United States*, explained that "when the

11

jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes *only after appropriate discovery*, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." 585 F.3d 187, 193 (4th Cir. 2009) (emphasis added). When an issue "is determinative of both jurisdiction and the underlying merits" of a claim, "dismissal under Rule 12(b)(1) is inappropriate." *Id.* at 196. Plaintiff's jurisdictional allegations are not "clearly immaterial" nor are they "wholly unsubstantial and frivolous." Accordingly, the Court declines to resolve, at the pleading stage, the jurisdictional challenge based on whether CBP performed an advanced search.

Nevertheless, the *ex parte*, *in camera* versions of the declarations set forth jurisdictional facts unrelated to the merits of Plaintiff's claim that relate to subject matter jurisdiction and the Court has therefore considered whether the Court may properly consider these *ex parte* declarations, without public disclosure.

Defendants' declarants attest that disclosure of the redacted information would hamper counterterrorism investigations, s*ee, e.g.*, [Robinson Decl.], ¶ 18, and the Court should consider the *ex parte* declarations in deciding whether there is jurisdiction, just as it did in *Elhady v. Piehota*, No. 16-cv-375-AJT-JFA (E.D. Va. May 31, 2022) in granting the government's motion to dismiss on jurisdictional grounds. [Doc. No. 29], at 4.[3]  Plaintiff urges the Court not to consider this "secret evidence" in evaluating whether to dismiss his claims; and in support of his position, Plaintiff points to the district court decision in *Ibrahim v. DHS*, where that court rejected the government's

---

[3] In *Elhady*, the government brought both a facial and factual challenge to standing; and the Court concluded that the complaint's allegations, none of which post-dated 2017, were stale and thus could not support the type of prospective injunctive relief that the Plaintiffs were seeking. *See* [Doc. No. 29-3], Ex. 3 (May 31, 2022 Hr'g Tr.) at 25:2-9 ("And the Court begins with reviewing the allegations of the amended complaint. . . .[T]he allegations of any consequences end no sooner than 2017 . . . . And there's no allegations here in the complaint, on the face of the complaint that, in the Court's view, would allow a reasonable inference that these plaintiffs . . . are being affected today by any of these policies."). For this reason. the *ex parte* submissions only "strengthened" the Court's conclusion that Plaintiffs' lacked standing and was not the sole basis for that determination. [*Id.*], (May 31, 2022 Hr'g Tr.) at 25:10-20.

attempt to submit an *ex parte* and *in camera* FBI declaration in support of its motion to dismiss plaintiff's complaint challenging her watchlist status. 2012 WL 6652362, at *5 ("[W]here the holder affirmatively seeks to use the evidence to win or to end the case, then, of course, any privilege must be deemed waived and both sides then have access to it, at least under an appropriate protective order. Here the government seeks to affirmatively use allegedly privileged information to dispose of the case entirely without ever revealing to the other side what its secret evidence might be.").

As a general rule, "[o]ur adversarial legal system [] does not tolerate *ex parte* determinations on the merits of a civil case." *Tonnesen v. Marlin Yacht Mfg., Inc.*, 171 F. App'x 810, 814 (11th Cir. 2006) (citation omitted); *see also Chekkouri v. Obama*, 158 F. Supp. 3d 4, 5-6 (D.D.C 2016) ("*Ex parte* submissions 'generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them." (quoting *U.S. v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995))). However, as one of the cases cited by Plaintiff acknowledges, there is an exception to the main rule "when the submissions involve compelling national security concerns or the statute granting the cause of action specifically provides for in camera resolution of the dispute." *Vining v. Runyon*, 99 F.3d 1056, 1057 (11th Cir. 1996); *Chekkouri*, 158 F. Supp. 3d at 6 (noting courts permit *ex parte* proceedings in the "rarest of circumstances," including where "the government has made 'a demonstration of compelling national security concerns'" (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986))); *see also Scherfen v. U.S. Dep't of Homeland Sec.*, 2010 WL 456784, at *4, *7-8 (M.D. Pa. Feb. 2, 2010) (considering law enforcement sensitive information *ex parte* and *in camera* to determine that Plaintiffs lack standing to maintain an action for prospective injunctive and declaratory relief).

Although the Court can surmise the national security aspects of some of the redacted information, Defendants have not provided any real explanation as to why the redacted information implicates "compelling national security concerns," particularly with respect to whether Plaintiff is or has been listed on the federal terrorist watchlist when the government discloses to other plaintiffs their status on the No Fly List. *See, e.g.*, *Long v. Pekoske*, 38 F.4th 417, 422-23 (4th Cir. 2022); *Fikre v. FBI*, 35 F.4th 762, 767 (9th Cir. 2022) ("*Fikre II*"). Absent such an explanation, the Court would hesitate to rely on secret evidence that potentially might completely dispose of Plaintiff's claim(s). Nevertheless, the *ex parte* declarations bear directly on whether this Court has subject matter jurisdiction, separate and apart from jurisdiction facts that are intertwined with the merits of Plaintiff's claim; and the Court has an "independent obligation to determine whether subject-matter exists." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). For these reasons, the Court concludes that it must under the circumstances of this case consider these *ex parte* applications to assess whether subject-matter jurisdiction exists.

The CBP Electronic Device Policy Plaintiff challenges only applies to individuals who are on the watchlist at the time of inspection. [Sabatino Decl.], ¶ 36. Plaintiff would therefore lack standing if he was never on the watchlist.[4] Likewise, he would lack standing if he was once on the watchlist but has since been removed, as he does not face a "real and immediate" threat of injury because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 111 (cleaned up); *see also Burke v. Barnes*, 479 U.S. 361, 363 (1987) ("Article III of

---

[4] While the policy allows for CBP officers to consider numerous factors in determining whether there is reasonable suspicion, Plaintiff is only challenging the aspect of the policy that allows CBP officers to rely on watchlist status as sufficient grounds for reasonable suspicion.

the Constitution requires that there be a live case or controversy at the time that a federal court decides the case."); *Steiffel v. Thompson*, 415 U.S. 452, 459 (1974) (the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy"). For example, in *Lebron v. Rumsfeld*, the Fourth Circuit affirmed the district court's conclusion that the plaintiff, who had previously been designated and detained as an enemy combatant, lacked standing to seek an order enjoining the government from designating him an enemy combatant in the future. *Lebron*, 670 F.3d at 560-61. The Fourth Circuit rejected the plaintiff's argument that he faced "immediate" danger of injury by virtue of his "prior enemy combatant designation and the government's failure to deny the possibility that it could designate him an enemy combatant in the future." *Id.* ("The Supreme Court has repeatedly rejected such a basis for standing. Time and again, the Court has reiterated that '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.' And it is equally insufficient for a plaintiff claiming standing to observe that the challenged conduct is repeatable in the future." (cleaned up)); *see also Scherfern*, 2010 WL 456784, at *8 ("As in *Lyons*, the cessation of the alleged wrongful conduct, *i.e.*, the purported placement on the TSDB, would render speculative any claim that Plaintiffs will again experience the kind of injury attributable to the alleged wrongful conduct that animates this litigation.").

Ostensibly in recognition that he may have been removed from the watchlist,[5] Plaintiff argues that his lack of standing *vel non* based on purported removal must be analyzed under the doctrine of mootness. [Doc. No. 34], at 2. A case becomes moot—and therefore no longer a case or controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *Long v. Pekoske*, 38 F.4th 417, 422-23

---

[5] The Court at this stage will honor the government's request and neither explicitly confirm or deny that Plaintiff is on the watchlist, has been removed from the watchlist, or has ever been on the watchlist.

15

(4th Cir. 2022) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "A case may become moot on appeal if there's 'a change in factual circumstances[,] . . . such as when the plaintiff receives the relief sought in his or her claim.'" *Id.* Here, the portion of the CBP Electronic Device Policy that Plaintiff challenges provides that one factor that might establish the necessary "reasonable suspicion" is the presence of an individual on a government-operated and government-vetted terrorist watchlist. [Sabatino Decl.], ¶ 36. But that provision only applies to individuals who are *on* the watchlist *at the time* of inspection. [*Id.*] Therefore, since Plaintiff's requested relief is tied to his presence on the watchlist,[6] his claims would be moot if he is no longer on the watchlist. *Long*, 38 F.4th at 423 ("Long has already received [his requested] relief. So 'our resolution of [the] issue could not possibly have any practical effect on the outcome of the matter.'" (citation omitted)). In short, Plaintiff's removal from the watchlist would essentially grant him the relief he seeks as all of his alleged future injuries are tied to his watchlist status.

Nevertheless, Plaintiff argues that the voluntary-cessation exception preserves his otherwise moot claims.[7] "[I]t is well settled that a defendant's voluntary cessation of a challenged practice' generally won't moot a plaintiff's claims." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The test for mootness in such cases is "stringent" to ensure courts are not "compelled to leave the defendant free to return to his old ways." *Id.* "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190. The voluntary relief also must "have completely and irrevocably

---

[6] *See, e.g.*, [Compl.] ¶ 141(b) (requesting injunction prohibiting Defendants from "applying CBP policy permits nonroutine detention and interrogation . . . solely because of watchlist status").

[7] The Fourth Circuit addressed a similar argument in *Long*. The Court recognized that "[a]t first blush, the government's sudden and unexplained decision to remove Long from the No Fly List cautions against a finding of mootness," noting that it has previously "declined to moot claims when the defendant 'retains the authority and capacity to repeat an alleged harm.'" *Id.* (citation omitted).

16

eradicated the effects of the alleged violation." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).

In *Fikre v. FBI*, the Ninth Circuit declined to moot plaintiff's claim after the government removed him from the No Fly List once litigation commenced despite the government filing a declaration explaining that Plaintiff "was removed from the No Fly List upon a determination that he no longer satisfied the criteria for placement on the [list]" and that he would "not be placed on the No Fly List in the future based on the currently available information." 35 F.4th 762, 767 (9th Cir. 2022) ("*Fikre II*") (finding plaintiff's claims not moot because the government's promises did "not ensure that [Plaintiff] 'will not be banned from flying for the same reasons that prompted the government to add him to the list in the first place'"). The Fourth Circuit, however, rejected *Fikre II*'s stringent application of the voluntary cessation doctrine as to the government. *Long*, 38 F.4th at 424-25 (determining that the Ninth Circuit's decision "goes too far" and "demands too much of the government"). In *Long*, like in *Fikre II*, "the government [] promised not to put [plaintiff] back on the No Fly List without new information that justifies doing so," but unlike in *Fikre II*, the Fourth Circuit determined that this promise satisfied the government's "burden to show the conduct [plaintiff] challenges is unlikely to recur." *Id.* at 424, 426. In reaching its decision, the Fourth Circuit even excused the government's lack of explanation for why Plaintiff no longer satisfied the No Fly List's criteria "so shortly before the government's briefing deadline." *Id.* at 425; *id.* at 426 ("[W]e think it appropriate—in this unique national-security context where the relevant decision-making is highly sensitive and confidential—to allow the government more leeway on its evidentiary burden than we otherwise might.").[8] In sum, based on the

---

[8] Here, the Robinson Declaration states that the "TSC never removes an individual from the TSDS as a matter of litigation strategy or convenience," but rather only removes an individual after "TSC personnel determine[], based upon a review of the available information, that the individual no longer satisfies the inclusion criteria." [Robinson Decl.], ¶ 16. Moreover, TSDS placement is the "result of the dynamic intelligence environment, regular reviews of

17

pronouncements in *Long*, Plaintiff does not under the voluntary-cessation exception to the mootness doctrine maintain standing he would not otherwise have. *See Long*, 38 F.4th at 425 ("To say otherwise would be to suggest the government risked national security simply to moot a lawsuit. This we decline to do.").[9]

Based on its review of the *ex parte* declarations, the Court concludes that Plaintiff lacks standing to pursue his claims.

### IV. CONCLUSION

For the foregoing reasons, the Court will issue a separate Order granting Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction as to Counts I-III of Plaintiff's Complaint [Doc. No. 28]

The Clerk is directed to enter copies of this Memorandum Opinion to all counsel of record.

_____
Anthony J. Trenga
Senior U.S. District Judge

November 7, 2022
Alexandria, Virginia

---

the data, and the redress process," and TSDS is subjected to "rigorous and ongoing quality control measures." [Doc. No. 35], at 6.

[9] Plaintiff contends that *Long* involved an as applied challenge, not a facial challenge, and because he is not challenging his placement on the watchlist and his challenge to CBP's Electronic Device Policy is in the nature of a facial challenge, *Long* does not require a finding of mootness. *See* [Doc. No. 34] at 5 ("Nur's claim is more like the facial challenge *Long* did not resolve than the as applied challenge that it did."); *see also Long*, 38 F.4th at 425 n.4 ("Whether Long's facial constitutional challenges are also moot is not before us."). But however his challenge to the CBP's policy is characterized, Plaintiff still requires standing and his standing is tied to his watchlist status, and if he is not on the watchlist, he is not in serious danger of being subjected to Defendants' allegedly wrongful behavior again, as noted above. Because the condition precedent to being subjected to the challenged policy is Plaintiff's watchlist placement, it is of no moment that the policy remains in place.